## THE MARY WEAVER.

### THE HARRY G. RUNKLE.

(District Court, E. D. New York. July 17, 1903.)

1. COLLISION—TUG WITH TOWS AND ANCHORED SCHOONER—FAILURE TO SOUND FOG SIGNALS.

A tug passing down New York Bay to sea at night with a number of dumpers in tow *held* in fault for a collision between one of the dumpers and an anchored schooner, on the ground that she was passing through the anchorage grounds; and the schooner also *held* in fault for failing to

124 F.—62

sound fog signals as required by the rules (article 15, subd. "d," Act June 7, 1897, c. 4, 30 Stat. 99 [U. S. Comp. St. 1901, p. 2880]), the evidence showing that she was near the limits of the anchorage grounds next the channel, and that there was such fog that her single light could not be seen from the tug until she was within 500 feet.

In Admiralty. Cross-libels for collision.

Hyland & Zabriskie, for schooner Mary Weaver and libelant Burden.

Alexander & Ash, for tug Harry G. Runkle and libelants Booth and others.

THOMAS, District Judge. On the night of November 1, 1902, at about 2 a. m., the tug Runkle was towing, on a hawser of some 80 fathoms, four dumpers singled out on lines severally about 60 fathoms in length. The tug was bound for sea, and pursued her course down the Upper Bay until the master of the tug saw, about 500 feet away, the schooner Mary Weaver, whose stern was swinging so far to the westward, as is claimed, that the tug's pilot deemed it prudent to attempt to avoid her by hard-astarboarding and going to port across her bows, whereby he entered the anchorage grounds. In this way the tug cleared the schooner, but the second dumper, No. 4, in passing came in collision with the jibboom and martingale of the schooner, and injuries arose both to her and to the dumper, which are involved in the above actions. The dumpers had steering apparatus, but no system of steering signals, the master of each dumper directing his course by that of the tug or of the dumper ahead. In this case each master so acted in that regard, except the master of the last dumper, who did not discover the light of the schooner until it was so late that he ported his helm and cut his hawser, so as to pass on the west side of the schooner. The schooner's light was burning. Her crew consisted of five men. The captain was ashore, and the mate, a person of doubtful responsibility, was in charge. There are two principal questions involved: First. Was the schooner on the anchorage grounds? Second. Should the schooner have rung a fog bell?

The evidence concerning the position of the vessel is very conflicting. It is unnecessary to discuss in detail the statements of the several witnesses on each side, which have been carefully considered, but there is a single fact which determines the probability against the tug. Kelly, master of the tug, testified that he set his course southwest by south 500 feet to the westward of the bell buoy at the lower part of the breakwater below Governor's Island, and that he continued on such course until opposite Buoy No. 14, which he cleared by 300 yards, when he changed his course to southwest by south one-half south, although the usual course from that point was south southwest. He also states that upon such course he would clear the bell buoy opposite Bay Ridge by about 150 yards. But if this course be laid down upon the map, it is perfectly clear that it crosses the anchorage grounds. The master of the tug also states that the schooner was "lying a little below half way between Buoy 14 and Bay Ridge bell," and that when he saw her 500 feet away "she was head on, little bit on the starboard; that is, the bulk of the vessel was on the starboard

side." He further states: "She was about on a line with 14 and the bell. She might been little outside of it, but from where I was it looked like she was on the line." He further states that she was about abeam with Robins' Reef light. The evidence of the master of the tug shows that his course took him across the anchorage grounds, and was calculated to bring him into collision with a vessel on such grounds. He admits that his usual course was half a point farther to the southward. If he pursued his usual course, much the more would he trespass upon the anchorage grounds. The superintendent, who visited the place the next afternoon, placed the schooner 1,000 feet outside the westerly limits of the anchorage grounds, and 1,000 feet above the white buoy, and 1,500 feet above the bell buoy. If she were 1,500 feet above the bell buoy, she was below the white buoy. He also places her 1,000 feet to the westward of the anchorage grounds. If so, the tug Runkle, upon the course ascribed to her by her master, would have passed far to the eastward of the schooner, and could not have collided with her.

There is much conflicting evidence as to the location of the schooner, but the statement of the master of the tug as to the point where he began to lay his course, and the course pursued by him, shows irresistibly that he was upon a course that would cross the anchorage grounds, and that he would not have cleared the Bay Ridge bell buoy by 150 yards to the westward. The course described·shows that the master was headed for the anchorage grounds, and it is probable he entered it before the collision. In order to come in collision with the schooner if she were in the position stated by the superintendent, it would have been necessary for the tug to lay her course some 1,800 feet off from the bell at Governor's Island; and to have cleared the bell buoy to the westward by 150 yards the tug must have laid her course at a distance from the bell buoy at Governor's Island largely in excess of that stated by the captain, and it would have been necessary for him to have cleared Buoy No. 14 by a much greater distance. But he gives two fixed positions—one 500 feet off the bell buoy at Governor's Island; the other 300 yards off Buoy No. 14, where he changed his course to the southward by half a point. Using either of these distances for the purpose of ascertaining his course, and making a fair allowance for inaccurate estimate of distances, he must inevitably have gone upon the anchorage grounds.

Was there a fog that prevented the tug, using due diligence, from seeing the schooner at an earlier time, and such as required a bell to be rung on the schooner pursuant to article 15, subd. "d," of the International Rules and Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 99 [U. S. Comp. St. 1901, p. 2880])? The requirement is that "a vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for about five seconds." The schooner attempts to show that there was no fog during the night, and the contention is upheld by all her witnesses, except the keeper at Robins' Reef light, who produced an official record made by him showing a fog between 3 and 11 o'clock a. m., sufficient to require fog signals to be given for the whole eight hours. He testified that such signals were given. The collision was about 2 a. m., but the evidence of the lighthouse

keeper indicates that the fog could reach the eastern anchorage grounds before it came to Robins' Reef. The record evidence of the keeper discredits the schooner's other evidence in regard to fog, and corroborates the evidence of the tug. The master of the schooner was ashore. The vessel was left in charge of the mate, who, as a witness, found favor with neither party; while the multiplicity of the cook's awakenings and visits to the deck were not demanded by any service or usual necessity, and the rest of the crew contributed no information. The fact is that the whole crew was fast asleep below, indifferent to any condition of weather, with the schooner near the boundary of a narrow channel, through which all the inbound and outbound vessels of the principal port of the country passed. While it is concluded that the schooner was within the anchorage grounds, she was near its westerly limits, and the fog, if not dense, was sufficient to obscure her. The only warning on the schooner was a white light, which was dimly seen by those on the tug when she was about 500 feet away. The fog may not have been as dense as the libelant Booth contends, but it was a fog obscuring a schooner not far within the anchorage grounds, whose entire crew was asleep below. The case falls within the rule. If the rule is to be of value, it should be followed, not only when a profound fog settles over the entire approach to a great port, but when it is sufficient to prevent moving vessels from discovering a ship at anchor in sufficient time to make usual maneuvers to avoid her. The case is more unfavorable to the schooner than was The Ophelia (D. C.) 44 Fed. 941, which is ample authority for the present conclusion.

Pursuant to these views, the damages and costs will be divided.